IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| LESLY ESTEFANY CANALES-MONDRAGON, Plaintiff, V. | ) ) ) ) ) | CIVIL ACTION FILE NO. |
| MARK D. CROWE, in his individual and official capacities as Sheriff of the Bryan County Sheriff's Department for Bryan County Defendant 1 | ) ) ) ) ) ) | _____ |
| WILLIAM E. WAYNE, Defendant 2 | ) ) ) | |
| JOHN "TRIPP" MEACHAM III, Defendant 3 | ) ) ) | |
| MATTHEW E. LYNN, Defendant 4 | ) ) ) | |
| DAVID BLIGE, Defendant 5 | ) ) ) | |
| CHELSEY D. QUINLAN, Defendant 6 | ) ) ) | |
| JOHN DOES 1–5, in their individual and official capacities, Defendants 7-11 | ) ) ) | **JURY TRIAL DEMANDED** |

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1

## **INTRODUCTION**

(1)

This is a Federal civil rights and state tort action arising from the wrongful arrest, unconstitutional jailing, and malicious prosecution of Plaintiff Lesly Estefany Canales-Mondragon by Bryan County Sheriff's Office personnel and employees.

(2)

Plaintiff seeks damages for violations of her Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983, as well as for state law claims, including false imprisonment and malicious prosecution under Georgia law.

## **PARTIES**

(3)

Plaintiff Lesly Estefany Canales-Mondragon is a legal resident of the United States of America and a resident of the State of Florida.

(4)

Defendant Mark D. CROWE is now and at all times material hereto the duly elected Sheriff of Bryan County, Georgia. He is sued in his individual and official capacities for his role as final policymaker and supervisor of the Bryan County Sheriff's Office (hereinafter "BCSO") in formulating, developing, and overseeing BCSO's policies, customs, or practices that caused the Plaintiff's Constitutional violation.

(5)

Defendant Officer William E. WAYNE is an officer for BCSO who was responsible for the initial detention and arrest of Plaintiff as outlined below.

(6)

Defendant Tripp MEACHAM is a Sergeant for BCSO who was present at the initial detention and arrest of Plaintiff, as outlined below, and participated in or approved Plaintiff's detention and arrest.

(7)

Defendant Matthew E. LYNN, is a Lieutenant for BCSO who was present at the initial detention and arrest of Plaintiff, as outlined below, and participated in or approved Plaintiff's detention and arrest.

(8)

Defendant David BLIGE, is a Major for BCSO who reviewed the conduct of Defendants WAYNE, MEACHAM, and LYNN and approved the incident report and conduct of the arrest, and participated in or approved Plaintiff's detention and arrest.

(9)

Defendant Chelsey QUINLAN, is a former officer for BCSO who was the "Evidence Manager" for BCSO who became aware that the Plaintiff was wrongfully arrested and did nothing to stop the prosecution of the Plaintiff.

(10)

All of the aforementioned Defendants are Peace Officer Standards and Training Council ("POST") certified law enforcement officers with the power of arrest and

associated duties and obligations under Georgia law. And all acted under color of state law at all times pertinent hereto.

### (11)

Defendants John Does 1–5 are unknown individuals believed to be employed by BCSO or acting on behalf of BCSO whose identities will be determined through discovery and are sued in their individual and official capacities for their conduct pertaining to the arrest and detention of Plaintiff and whose policies, customs and practices caused or contributed to the detention, arrest, and prosecution of Plaintiff.

## JURISDICTION AND VENUE

### (12)

This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

### (13)

Supplemental jurisdiction over state law claims is proper under 28 U.S.C. § 1367.

### (14)

Venue is proper in this Court under 28 U.S.C. § 1391(b), as the events giving rise to the claim occurred in Bryan County, Georgia in the Savannah Division of the Southern District of Georgia.

## FACTUAL BACKGROUND

### I.    *BCSO POLICIES, CUSTOMS, AND PRACTICES*

#### Introduction

### (15)

BCSO, under the direction of CROWE, failed to provide appropriate narcotics field-test kits, failed to train deputies in their use, lacked policies and oversight regarding drug testing, and failed to provide meaningful oversight of officers employed by BCSO. BCSO relied on instructions in the kits rather than on formal training for using field-test kits. For over a decade, BCSO purchased only secondary/subsequent test kits, knowingly misusing them as primary screening tools. CROWE knew or should have known that these failures created a substantial risk of wrongful arrests.

BCSO, by and through Defendant CROWE, did not, as it affects this case, and does not currently supply officers with the appropriate narcotic field-testing kits by which they can make a correct presumptive determination of what, if any, narcotics they have located.

(16)

BCSO did not and does not have any policy, procedure, or training for drug-testing kits for officers in place at the time of the incident that is the subject of this lawsuit.

(17)

The named Defendants do not have any training on the use of drug field-testing kits. Defendants BLIGE nor any of the other Defendants questioned or inquired as to why WAYNE, or some other Defendant, twice tested the suspected heroin that was the basis for Plaintiff's wrongful arrest.

(18)

The Defendants were fully aware of a substantial risk of serious harm (e.g., false positives leading to wrongful detention or punishment) and disregarded that risk by failing to take reasonable steps to ensure that appropriate equipment was available to officers, that officers had appropriate training, and that officers undertook appropriate training.

### *BCSO field-test Kits*

(19)

Around the time of the incident that is the subject matter of this lawsuit, for suspected heroin, BCSO "Evidence and Property Management" policies required the use of one of two "Drug Kits".

(20)

BCSO used two field-tests for heroin: (1) NIK-L kits manufactured and distributed by Safariland, LLC, and (2) Narcotics Analysis Reagent Kit II "Fentanyl Reagent" Test Kit "33" (hereinafter "NARK II- Fentanyl")  kits manufactured and distributed by Sirchie Acquisition Company, LLC.

(21)

NARK II- Fentanyl kits are designed and intended to identify either Fentanyl or Acetyl-fentanyl, which are occasionally "cut" into heroin in addition to being sold as standalone substances.

(22)

Sirchie also manufactures a NARK II- "Mecke's Modified Reagent (all Heroin)" Test

Kit "11, that uses the same testing process as the NIK-L kit and is designed for heroin

detection instead of NARK II- Fentanyl, which is designed and intended for the

detection of synthetic opioids.

(23)

The Modified Mecke Reagent is Mecke's Reagent (selenious acid ($H_2SeO_3$) dissolved

in concentrated sulfuric acid ($H_2SO_4$)) with a stronger 1% solution versus the

non-modified test.

(24)

BCSO "Evidence and Property Management" adopted policies rely on the position

"**EVERY DRUG KIT CONTAINS PRINTED USER INSTRUCTIONS**"

(25)

With each box of ten (10) NIK-L individual test pouches shipped, Safariland provides

one folded paper "Identidrug chart".

(26)

Safariland also provides law enforcement, upon request, the "NIK Basic Competency

Training Kit" and "NIK Self-Training Flash Drive" with a post-training exam and

certification.

(27)

BCSO does not use the "NIK Basic Competency Training Kit" or the "NIK

Self-Training Flash Drive" that the manufacturer supplies upon request.

(28)

Most law enforcement agencies that use NIK products require personnel to complete the training course or use the flash drive, ensuring a minimum level of competency. This is because without proper training, there's no assurance that the test is being used or interpreted correctly.

(29)

The NIK-L test is prone to false positives when improperly used, particularly when an excessive sample is placed in the kit.

(30)

The Safariland NIK tests are intended to be a "polytesting system" with users instructed to follow a flow chart outlined on the "Identidrug chart" when encountering a suspected narcotic.

(31)

The polytesting system relies on a series of testing packets, always beginning with an NIK "A" "Marquis Reagent" test packet and proceeding through a series of tests before reaching a presumptive identification of a suspected narcotic.

(32)

By example, to presumptively identify an unknown material as heroin, users should begin with NIK "A", then if the test shows a "purple" result, move to NIK "U", "Methamphetamine Reagent", then if that test shows a "brown" result, move to NIK-L, concluding with a "green" result if positive for heroin or use NIK "K",

"Opiates Reagent", concluding with a "olive" shifting to "purple" result if positive for heroin.

(33)

In the past ten years, BCSO has only procured and provided to officers, NIK "G" "Scott Reagent (Modified)" used to identify cocaine hydrochloride and derivative drugs presumptively; NIK "U" used to identify methamphetamine and MDMA presumptively; NIK "E" used to identify cannabinoids presumptively;  and NIK-L kits.

(34)

With the exception of NIK "E", all of the kits BCSO procured and provided officers are classified as secondary/subsequent tests within the NIK Polytesting System, used to confirm and differentiate results indicated by the initial screening reagents for unknown substances.

### BCSO POLICY MAKING AND POLICY IMPLEMENTATION

(35)

As outlined above, BCSO has, for the past 10 years, not purchased any field drug-testing kit as directed by the manufacturer, Safariland, to ensure narcotics officers are properly tested when narcotics are of an unknown type.

In its purchase of narcotic field-testing kits, BCSO has engaged in a pattern and practice of knowingly and wilfully misusing these kits that made an unconstitutional arrest, as what happened to the Plaintiff as outlined below, inevitable.

## *BCSO LACK OF TRAINING*

(36)

As outlined above, BCSO does not require any training and instead relies on a read-the-instructions approach to officer use of narcotics field-testing equipment.

(37)

BCSO did not require, nor did it have a policy requiring, officers to have any training in the use of narcotics field-testing equipment.

(38)

BCSO did not provide any classroom or on-the-job training for officers to use narcotics field-testing equipment.

(39)

None of the Defendants has any training in the use of narcotics field-testing equipment.

(40)

Nothing in any of the Defendants' personnel files obtained from BCSO indicates any training in the use of narcotics field tests.

(41)

Moreover, none of the Defendants' POST certification records show any narcotics field-test use before the date of Plaintiff's arrest.

(42)

Finally, any claimed on-the-job training or other claimed sufficient training, as applies in this case, fails, as the failure of the training is evident on its face, given the repeated false-positive field tests outlined below.

### *BCSO LACK OF OVERSIGHT AND ACCOUNTABILITY*

#### (43)

As outlined below, the incident report generated from the encounter with Plaintiff is replete with spelling errors and factual ambiguities, rendering it a useless aid for refreshing recollection or appropriately documenting the encounter with law enforcement.

#### (44)

Significantly, BLIGE, as the approving authority, did not apparently question or inquire as to why WAYNE, or whoever made the two field tests reflected, felt the need to undertake a second field test.

#### (45)

None of the Defendants observed the suspected heroin and decided that the material could be anything other than heroin.

#### (46)

BCSO failed to train, properly equip, and supervise officers in drug field-testing, a failure that constituted deliberate indifference to Constitutional rights.

### II.    *PLAINTIFF'S ARREST OF DECEMBER 11, 2022*

#### Introduction

(47)

On December 11, 2022, Plaintiff was stopped by WAYNE in Bryan County, Georgia.

WAYNE claimed she committed traffic violations and discovered a bag of Maxwell

House instant coffee, which Plaintiff explained was for caffeine. Despite the absence

of any heroin-use paraphernalia, WAYNE and potentially other Defendants used an

NIK-L field-testing kit twice, claiming false positive results for heroin. Plaintiff was

arrested, charged with heroin trafficking, and jailed. Supervisors MEACHAM, LYNN,

and BLIGE approved or failed to intervene. Body cameras malfunctioned or were

unavailable, and no photographs documented the alleged positive tests. Plaintiff spent

more than a month incarcerated, missing her infant child's first Christmas. The

Georgia Bureau of Investigation lab later determined the substance contained no

controlled substances, and QUINLAN reviewed that report twice, in November and

December 2023, but did nothing to address the criminal charges. Prosecution

continued until August 2024, when the trafficking charge against the Plaintiff was

finally dismissed.

### *Initial Stop*

(48)

With the above as a background, on December 11, 2022, Plaintiff was driving on

Interstate 95 in Bryan County, Georgia.

(49)

Plaintiff had a Florida license plate on her vehicle.

(50)

Plaintiff has a Florida driver's license.

(51)

WAYNE, acting within the course and scope of his official duties, stopped Plaintiff's vehicle after activating the lights on his patrol vehicle.

(52)

WAYNE alleged the Plaintiff was speeding and failed to maintain the lane as the basis for the stop.

(53)

Plaintiff's race, color, religion, sex, national origin, place of residence, and place of registration of her vehicle had nothing to do with the basis for WAYNE's decision to stop Plaintiff.

(54)

WAYNE allegedly located an open container of alcohol in the Plaintiff's vehicle, a small amount of marijuana, marijuana smoking paraphernalia, an uncorked bottle of alcohol, and alleged that the Plaintiff was driving with an expired license.

(55)

At the stop, WAYNE located a bag containing a brownish powdered substance in the Plaintiff's vehicle's glove box.

(56)

Plaintiff informed WAYNE that the bag of powdered substance was Maxwell House instant coffee beverage mix, which Plaintiff explained her mother gave her for the drive because of the caffeine in the coffee.

(57)

WAYNE, or one of the other Defendants, did not believe the Plaintiff and instead surmised that the coffee with heroin

(58)

None of the items commonly associated with heroin use or possession with intent to distribute were located with the instant coffee. These would include, but are not limited to: small plastic baggies, balloons, foil squares, burnt or bent spoons, bottle caps or metal containers, cotton balls, cigarette filters, q-tip swabs, water vials or small bottles, syringes, tourniquets, aluminum foil with burn marks, straws, hollowed pens, glass pipes, razor blades, mirror or flat glass surfaces, empty gel capsules or large sums of money.

(59)

Heroin is a Schedule One controlled substance under Georgia and Federal law.

(60)

Other illegal and controlled substances can appear in a brownish powder form, including, but not limited to: cocaine, methamphetamine, synthetic cathinones ("Bath Salts"), 3,4-Methylenedioxymethamphetamine ("MDMA"), and opium.

(61)

WAYNE, or one of the other Defendants, conducted an initial field-test of the

powdered substance using an NIK-L test kit at the location and claimed it yielded a

positive result for heroin.

(62)

WAYNE, or one of the other Defendants, erroneously decided the coffee was

"Herion" (sic) by using a "NIC (sic) FIELD KIT" according to Defendant WAYNE's

incident report.

(63)

After the Plaintiff's detention, WAYNE, or one of the other Defendants, conducted a

second field-test of the powdered substance using a NIK-L kit and again claimed it

yielded a positive result for "Herion"(sic) after returning to the Sheriff's Office.

(64)

WAYNE's body camera malfunctioned and did not record the incident.

(65)

MEACHAM and LYNN were present and witnessed the events mentioned above.

(66)

Neither MEACHAM nor LYNN had body cameras available.

(67)

No photos were taken of either positive NIK-L test result.

(68)

BLIGE reviewed WAYNE's report and approved it as the supervising officer.

*Arrest*

(69)

Plaintiff was arrested on or about December 11, 2022, and charged with driving offenses, misdemeanors, and trafficking heroin.

(70)

In Georgia, heroin trafficking requires a bond to be set by a Superior Court judge.

(71)

However, a Bryan County magistrate Judge set bond in the heroin trafficking charge.

(72)

Upon information and belief, the Atlantic Judicial Circuit Superior Court has entered a standing order or case-specific order authorizing the Bryan County magistrate to hear bond and set for trafficking cases.

(73)

Plaintiff's bond was set on December 13, 2022, for trafficking heroin at $75,000 cash or $150,000 property bond, along with significantly lesser bonds for the other charges.

(74)

Plaintiff incurred the expense of retaining a criminal defense attorney to handle her heroin trafficking charge and other charges.

(75)

Plaintiff was incarcerated through January 25, 2023, missing her infant child's first Christmas, before her bond was reduced for trafficking heroin and she could afford to get out.

### Post-Arrest conduct

(76)

An unknown Defendant at an unknown time submitted the "Herion" to the Georgia Bureau of Investigation ("GBI") Division of Forensic Sciences lab ("DOFS") for testing.

(77)

On November 10, 2023, GBI DOFS conclusively determined that the substance submitted by the Defendants contained no controlled substances.

(78)

On November 20, 2023, QUINLAN, with the title "ICAC Investigator; Evidence [Manager]" with BCSO, acting within the course and scope of her employment, accessed the GBI DOFS secured database and reviewed the case associated with Plaintiff and viewed the lab report, which clearly stated "No controlled substances confirmed in the sample tested."

(79)

On December 1, 2023, QUINLAN, with the same title, again accessed the GBI DOFS case associated with Plaintiff and viewed the same lab report.

(80)

17

On July 29, 2024, an Unknown Assistant District Attorney with the Atlantic Judicial Circuit accessed the GBI DOFS case associated with Plaintiff, viewed the lab report, and that same day, began the process to dismiss the Plaintiff's warrant for trafficking heroin via nolle prosequi.

(81)

The warrant for trafficking heroin against the Plaintiff was then filed and became effective on August 26, 2024.

(82)

The other charges of Possession of Drug Related Objects, Marijuana-Possess Less Than 1 Ounce, Speeding, Driving under the Influence of Drugs (less safe), Weaving Over Roadway, Open Container Violation, and Expired or No Driver's License were resolved with a plea to Speeding 84 in a 70 and weaving over the roadway.

## ANTE LITEM NOTICE

(83)

On February 6, 2025, Plaintiff's timely and valid ante litem notice was received by Carter Infinger, Chairman of the Bryan County Board of Commissioners, and CROWE.

(84)

That same day, on February 6, 2025, Iris Coleman, with the title "ICAC Investigator; Evidence Ma[nager]" with BCSO, accessed the GBI DOFS case associated with

Plaintiff and again viewed the lab report showing "No controlled substances confirmed in the sample tested."

(85)

Supplemental ante litem notice, specifically including the conduct of QUINLAN, was received prior to August 25, 2025.

## CLAIMS FOR RELIEF

(86)

Plaintiff incorporates by reference the above paragraphs herein as if fully set forth.

### *ESTABLISHED AND CONTROLLING LAW*

(87)

In December 2022, it was clearly established law that:

(a)

Local governments can be sued under 42 U.S.C. § 1983 for Constitutional violations resulting from an official policy or custom when the execution of a government's policy or custom inflicts injury. Monell v. Dept. of Social Services, 436 U.S. 658 (1978)

(b)

Failure to train can amount to a policy or custom, and can be a moving force behind a Constitutional violation. Connick v. Thompson, 563 U.S. 51 (2011)

(c)

A municipality's failure to train can amount to deliberate indifference. City of Canton v. Harris, 489 U.S. 378 (1989)

(d)

A warrant is not valid if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth, and law enforcement officers may not fabricate evidence or falsify warrants. Franks v. Delaware, 438 U.S. 154 (1978)

(e)

Police officers may not falsify evidence, fabricate facts, or omit material exculpatory information to establish probable cause, and officers also cannot unreasonably ignore readily available evidence that would have shown a suspect's innocence. Kingsland v. City of Miami, 382 F.3d 1220 (11th Cir. 2004)

(f)

An officer may not rely upon false statements by others in support of a warrant application where a reasonable officer would have known that the facts stated in the affidavit do not constitute probable cause.  Malley v. Briggs, 475 U.S. 335 (1986)

(g)

Officers violate the Fourth Amendment when they intentionally or recklessly include false statements or omit material facts in arrest warrants or affidavits. This includes failure to disclose exculpatory evidence or fabricating probable cause to pursue more serious charges. Williams v. Aguirre, 965 F.3d 1147 (11th Cir. 2020)

(h)

Officers have an obligation to disclose exculpatory evidence. Brady v. Maryland, 373 U.S. 83 (1963)

(i)

Officers cannot unreasonably and knowingly disregard or ignore evidence or refuse to
take an obvious investigative step that would readily establish that they lack probable
cause to arrest a suspect. <u>Cozzi v. City of Birmingham</u>, 892 F.3d 1288 (11th Cir. 2018)

(j)

A police officer can be held liable under 42 U.S.C. § 1983 for failing to intervene when
another officer violates a person's Constitutional rights; specifically, where an officer is
present at the scene and has both the ability and opportunity to prevent the
constitutional violation, but chooses not to act, that officer may be liable. <u>Priester v.
City of Riviera Beach</u>, 208 F.3d 919 (11th Cir. 2000)

(k)

An officer who is present at the scene and who fails to take reasonable steps to
protect the victim of another officer's use of excessive force can be held liable under
42 U.S.C. § 1983 for his nonfeasance. <u>Hadley v. Gutierrez</u>, 526 F.3d 1324 (11th Cir.
2008).

### *INDIVIDUAL DEFENDANTS*

### Introduction

(88)

Plaintiff maintains claims against both the individual officers involved in her unlawful
arrest and the BCSO for its <u>Monell</u> conduct. The individual officers' conduct
amounted to recklessness and deliberate indifference, supporting claims of a violation

of 42 U.S.C. § 1983. In addition, the Plaintiff establishes valid state tort claims with sovereign immunity waived. Against BCSO, the failure to train, policy of overreliance, or systemic negligence in field-testing kits each used support claims. All Defendants acted with reckless disregard for Constitutional rights, which was objectively unreasonable under the circumstances. Further, all Defendants acted with gross negligence amounting to deliberate indifference.

### Count I – 42 U.S.C. § 1983 – False Arrest and Malicious Prosecution
### (Against WAYNE, MEACHAM, LYNN, BRYAN, QUINLAN and DOES)

(89)

Plaintiff was seized under legal process and color of law.

(90)

The legal process justifying the Plaintiff's seizure was constitutionally infirm

(91)

The officer who applied for the warrant should have known that his application failed to establish probable cause.

(92)

The officer intentionally or recklessly made misstatements or omissions necessary to support the warrant.

(93)

The criminal proceeding terminated in the Plaintiff's favor

(94)

The seizure would not otherwise be justified.

(95)

WAYNE lacked probable cause to arrest Plaintiff for heroin trafficking and knew or should have known the field-test result was unreliable.

(96)

MEACHAM, LYNN, BRYAN, QUINLAN, and DOES knew or should have known of the violation and failed to intervene in the arrest and prosecution.

(97)

Plaintiff was deprived of liberty in violation of her Constitutional rights.

### Count II – 42 U.S.C. § 1983 – Malicious Prosecution

### (Against WAYNE, MEACHAM, LYNN, BRYAN, QUINLAN and DOES)

(98)

The Defendants instituted or continued a criminal prosecution against the Plaintiff.

(99)

The Defendants were responsible for the prosecution by initiating it or continuing it.

(100)

The prosecution was without probable cause.

(101)

The Defendants acted with malice and intent to deprive the Plaintiff of Constitutional rights.

(102)

The criminal case ended in the Plaintiff's favor.

(103)

The prosecution caused a Fourth Amendment seizure with the arrest, pretrial

detention, and restrictive bond conditions.

(104)

WAYNE, MEACHAM, LYNN, BRYAN, and DOES initiated criminal prosecution

against the Plaintiff without probable cause and did so with malice and the intent to

deprive the Plaintiff of her Constitutional rights.

(105)

QUINLAN, aware that there was no factual basis to support prosecution for

trafficking heroin, continued the prosecution against the Plaintiff by failing to act to

dismiss the charge.

### Count III – 42 U.S.C. § 1983 – Fabrication of Evidence

### (Against WAYNE,  MEACHAM, LYNN, BRYAN, QUINLAN and DOES)

(106)

The defendants were state actors acting under color of law.

(107)

Defendants deliberately and knowingly fabricated evidence.

(108)

The fabricated evidence was material, affected the fairness of the proceedings, and was likely to influence a magistrate's decision to issue a warrant or a prosecutor's decision to bring charges, a judge's pretrial ruling, or the jury's verdict.

(109)

The fabricated evidence caused the Plaintiff to suffer a deprivation of liberty

(110)

WAYNE, MEACHAM, LYNN, BRYAN, QUINLAN and DOES lacked probable cause to arrest Plaintiff and knowingly, willfully, recklessly deliberately fabricated evidence and failed to disclose exculpatory evidence against the Plaintiff.

### *Count IV – 42 U.S.C. § 1983 – Failure to Disclose Exculpatory Evidence*
### *(Against WAYNE, QUINLAN, and DOES)*

(111)

Defendants withheld evidence favorable to the defense, including the GBI report wherein it was determined the field-test at issue was wrong and that there were no controlled substances of any kind in the coffee that Plaintiff was arrested for possession of, as trafficking heroin.

(112)

The evidence was suppressed, intentionally, knowingly and willfully.

(113)

Defendants failed to turn over exculpatory evidence to the District Attorney.

(114)

The failure to provide exculpatory evidence resulted in a deprivation of Plaintiff's liberty and the continued prosecution of the charge for trafficking heroin against her.

(115)

WAYNE and QUINLAN knowingly, willfully, recklessly, deliberately, and or intentionally failed to dismiss the criminal action against the Plaintiff or notify anyone who could make that determination, including the District Attorney's office, once irrefutably aware that the Plaintiff had not engaged in illegal activity.

(116)

BCSO has no policy requiring that exculpatory evidence be provided, nor that cases be dismissed once it is determined that there was no valid basis for arrest.

(117)

WAYNE and QUINLAN's fabrication of inculpatory evidence while hiding exculpatory evidence compounded the constitutional injury.

### *Count V – False Imprisonment under Georgia Law*

### *(Against All Individual Defendants)*

(118)

Plaintiff was unlawfully detained and imprisoned without legal justification under Georgia law under O.C.G.A. § 51-7-20.

### *Count VI – False Arrest under Georgia Law*

### *(Against All Individual Defendants)*

(119)

Defendants arrested Plaintiff under a warrant that is void, and without probable

cause, in violation of  O.C.G.A. § 51-7-1.

### Count VII – Malicious Prosecution under Georgia Law

### (Against All Individual Defendants)

(120)

Defendants instituted and maintained a prosecution against the Plaintiff without

probable cause and with malice, resulting in injury to Plaintiff in violation of O.C.G.A.

§ 51-7-40

### Count VIII – Intentional Infliction of Emotional Distress (Against All Individual

### Defendants).

(121)

Defendants' conduct was willful, wanton, and intended to cause or was in reckless

disregard of the probability of causing emotional distress to the Plaintiff.

(122)

The Plaintiff, in fact, suffered emotional distress remaining in confinement for over a

month and as otherwise.

(123)

Plaintiff suffered harassment, threats, and intimidation while in confinement.

(124)

Plaintiff suffered the Defendants' abuse of their position of power and authority.

(125)

The distress, being locked up knowing full well she is not guilty, hundreds of miles from home, having other inmates and guards ridicule her, having her booking photo placed in the public, losing her job, missing her child's first Christmas, having the social stigma of the arrest and ongoing social stigma of the charges seemingly having been dropped for no-reason, have created emotional distress such that no reasonable person could be expected to endure it.

## POLICY/<u>MONELL</u> DEFENDANTS

### Count IX – 42 U.S.C. § 1983 – Failure to Train and Supervise

### (Against Bryan County and BCSO, through CROWE and DOES)

(126)

Plaintiff was unlawfully arrested for trafficking heroin.

(127)

Bryan County, through BCSO, failed to train officers or require training on the use of the field narcotics testing equipment it issued to officers. It did not supply officers with the correct equipment to field-test narcotics, including the Defendants. And made an official decision not to adequately train or supervise employees in the use of field-testing equipment or reporting exculpatory information.

(128)

The failure to train or supervise amounted to deliberate indifference to the rights of persons with whom the employees come into contact, including the Plaintiff.

(129)

This deliberate indifference can be demonstrated by the pattern of two instances of similar constitutional violations by untrained employees: the coffee obtained from the Plaintiff was field tested twice, yielding two false-positive readings, and the negative GBI DOFS report was reviewed twice, with no effort to address the charges.

(130)

Deliberate indifference involves a risk of Constitutional violations so obvious that failing to train is itself evidence of such indifference.

(131)

There is a direct causal link between the training/supervision failure and the constitutional injury; that is, the lack of training and supervision was the moving force behind the violation, not just tangentially related.

(132)

CROWE and DOES personally participated in the development and implementation of the policies that caused the violation and were the final decision-maker(s) for those policies.

(133)

There is a causal connection between the supervisor's failure to act and the violation, such that the failure to correct known unconstitutional practices or a custom of inadequate supervision leads directly to the misconduct.

(134)

CROWE and DOES did not implement policies to provide the correct field-testing equipment for officers to do anything more than attempt to confirm a hunch that any substance they came in contact with was narcotics, and told officers to "follow instructions" that were inconsistent with the correct use of the equipment so provided.

**Count X – 42 U.S.C. § 1983 – Policies or Custom Causing Constitutional Violations (Against Bryan County and BCSO, through CROWE and DOES)**

(135)

Bryan County, through BCSO,  is a governmental entity acting under color of state law.

(136)

Plaintiff suffered a substantial Constitutional violation under the 4th Amendment and 14th Amendment of the U.S. Constitution for the conduct outlined above.

(137)

BCSO has a Standard Operating Procedure (hereinafter "SOP") in place, promulgated and authorized by CROWE.

(138)

The BCSO SOP does not require that officers have any narcotics field-testing experience or training, nor policies addressing field-tests to purchase, nor any reporting requirement for officers to report exculpatory evidence or evidence of actual innocence nor any accountability in the accuracy of reports or questioning of officers conduct that would amount to any sort of checks nor any policy to avoid the type of wrongful arrest and prosecution that the Plaintiff suffered.

(139)

These policies and customs were the moving force behind the constitutional violation suffered by the Plaintiff.

(140)

BCSO's failure to implement policies so needed resulted in the Plaintiff's wrongful arrest and prosecution, and was the direct causal link for both.

### Count XI– Negligent Hiring/Retention/Supervision under Georgia Law
### (Against Bryan County and BCSO, through CROWE and DOES)

(141)

Bryan County, through BCSO, owed a duty to the Plaintiff (and the public) to exercise reasonable care in hiring, retaining, and supervising employees and officers.

(142)

This duty arises when it is reasonably foreseeable that hiring/keeping/supervising a particular employee could pose a risk of harm to others.

(143)

Bryan County, through BCSO breached that duty by hiring, retaining, or failing to supervise Defendants who the employer knew or should have known were not suited for the job, or posed a risk of harm to others.

(144)

Specifically, but not fully inclusively, QUINLAN's access to GBI evidence databases while monitored by the GBI was not monitored by Bryan County through BCSO. Similarly, BLIGE's oversight of the officers in the case, and his review and acceptance of an incident report replete with grammatical and spelling errors, containing vague factual allegations, and raising questions about why the officers involved engaged in specific actions, show a total lack of meaningful oversight within the BCSO.

(145)

Bryan County, through BCSO, knew or should have discovered the risk through reasonable investigation.

(146)

Plaintiff's arrest was caused by and prosecution was extended by Bryan County's negligence in supervision and Defendants' acts.

(147)

Plaintiff suffered actual injury and damages as a result of the Defendants' conduct, which was proximately caused by the employer's negligence.

## **PRAYER FOR RELIEF**

(148)

**WHEREFORE**, Plaintiff respectfully requests:

(a)

That process issue and service be perfected;

(b)

That she be awarded compensatory damages in an amount to be proven at trial for the following, among other bases proven at trial:

(1) General Damages

(2) Injury to peace, happiness, and feelings

(3) Humiliation

(4) Embarrassment

(5) Mental Anguish

(6) Lost Wages

(7) Lost time from detention

(8) Medical expenses

(9) Attorney's fees for retaining an attorney for the criminal case

(10)    Travel expenses

(11)    Other out-of-pocket costs

(12)    Reputational damages

(13)    Loss of standing in business and profession

(14)    Injury to reputation in the community

(15)    Time wrongfully spent incarcerated or under restrictive bond/probation

conditions.

(c)

Punitive damages be awarded against individual Defendants for their conduct

demonstrated as intentional, fraudulent, malicious, reckless, with callous indifference,

and evil motive, or intent.;

(d)

That reasonable attorney's fees and costs be awarded pursuant to 42 U.S.C. § 1988;

(e)

That the Court grant such other and further relief as it deems just and proper,

including but not limited to ordering training and equipping of BCSO officers and

Federal oversight of BCSO for a period of time to ensure it maintains a sufficient

standard to protect individuals traveling in interstate commerce who are forced to

travel through Bryan County due to its proximity.

## **JURY DEMAND**

(149)

Plaintiff demands a trial by jury on all issues so triable.

This 29th day of October 2025

**/S/ Robert T. Homlar**
Robert T. Homlar
GA Bar Number: 364714
Attorney for PLAINTIFF

Robert T. Homlar P.C.
580 James Brown Blvd.
Augusta, GA 30901
(706) 831-0859/ Telecopier (706) 432-1722
robert@homlarlaw.com